Mitchell Chyette, State Bar No. 113087
Law Office of Mitchell Chyette
125 12th Street, Suite 100-BALI
Oakland, CA 94607-3699
(510) 388-3748 telephone
(510) 680-3760 facsimile
mitch@chyettelaw.com

[Additional Counsel listed on subsequent page]

Attorneys for Plaintiff Desiree Schmitt
and the Putative Class

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

DESIREE SCHMITT, individually, and on behalf of all others similarly situated,

      Plaintiff,

  v.

SN SERVICING CORPORATION, an Alaska Corporation,

      Defendant.

Case No. 3:21-cv-03355-WHO

District Judge William H. Orrick

**SECOND AMENDED CLASS ACTION COMPLAINT**

Jury Trial Demanded

Complaint filed: March 12, 2021
Trial Date: None Set

1

Plaintiff Desiree Schmitt ("Plaintiff"), by and through counsel, on behalf of herself and all other persons similarly situated, brings this Second Amended Class Action Complaint against Defendant SN Servicing Corporation ("Defendant" or "SNSC"), and alleges as follows, based on personal knowledge as to her own experiences and on information, belief, and investigation as to all other matters.

### NATURE OF THE ACTION

1. This consumer data breach class action arises out of SNSC's unreasonable, unlawful, and unfair practices with regard to its collection and maintenance of the highly sensitive and confidential personal and financial information of persons whose loans it services. SNSC's insufficient and unreasonable data security practices facilitated a data breach (the "Data Breach"), exposing Plaintiff's and Class members' personal and financial information to criminals in a ransomware attack.

2. The information compromised, exposed, and taken in the Data Breach consists of some of the most sensitive and damaging information when in the hands of criminals, including Social Security numbers, financial account information, credit information, names, contact information, addresses, property information, and loan ID numbers, and as well as details regarding the loan status, balances, payments, and fees and charges. Moreover, the information relates to what is for many the single most important asset, both subjectively and objectively—their home.

3. The information stolen in the Data Breach can be used alone, and in conjunction with other pieces of information, to perpetrate crimes against Plaintiff and Class members that can result in significant liability and damage to their money, property, creditworthiness, reputation, ability to pay current loans, improve their credit, and/or obtain loans on favorable terms in the future.

4. SNSC's conduct violated and continues to violate the law and breach duties of care it owes to those whose loans it services and from whom SNSC profits. Plaintiff brings claims against SNSC for its negligence, and violations of the Unfair Competition Law, Cal. Bus. & Prof. Code § 17000, *et seq*.

5. Plaintiff, individually, and on behalf of all other persons similarly situated, seeks to be made whole for her losses and damages incurred and which will be incurred in the future to remedy and mitigate the risk of identity theft and fraud that the Data Breach presents. Plaintiff also seeks injunctive relief in the form of compliant data security practices, full disclosure regarding the disposition of the

information in SNSC's systems, and monitoring and audits of SNSC's security practices going forward.

## JURISDICTION AND VENUE

6.     The Court has subject matter jurisdiction under 28 U.S.C. § 1332(d) because this case is brought as a class action under Fed. R. Civ. P. 23, Plaintiff and Defendant are diverse, 100 or more persons make up the proposed Class, and the amount in controversy exceeds $5,000,000, exclusive of costs.

7.     The Court has personal jurisdiction over Defendant because SNSC's principal place of business is in California, it regularly does business in California, and the damages it causes affect California residents, among others.

8.     Venue is proper in this Court because a substantial part of the acts and omissions giving rise to Plaintiff's and Class members' claims occurred in this District and Defendant resides in this District. Further, SNSC's Terms and Conditions (https://borrower.snsc.com/TermsAndConditions.aspx (last accessed February 2, 2021)) provide that it can be sued in the Superior Court for the City and County of San Francisco, as well as a choice-of-law provision selecting the laws of the State of California, without giving effect to conflict of laws provisions.

## PARTIES

9.     Plaintiff is a natural person. Plaintiff is a resident and citizen of Ohio.

10.     SNSC is an Alaska corporation, with its principal place of business in California. SNSC's officers are located in California, and SNSC's main loan servicing operations are in Eureka, California. SNSC is a financial services corporation that specializes in servicing of residential, small balance commercial, consumer, and unsecured loans. SNSC services Plaintiff's home loan.

## GENERAL ALLEGATIONS

### *The Data Breach*

11.     According to SNSC's Privacy Policy, located online at borrower.snsc.com/PrivacyPolicy.aspx Rev. 03.21 (last visited August 12, 2021), and attached hereto as Exhibit A, "[t]o protect your personal information from unauthorized access and use, we use security measures that comply with federal law. These measures include computer safeguards, secured files and buildings."

12.    According to SNSC's Privacy Policy (Exhibit A), SNSC collects the following information from persons whose loans it services directly from the persons themselves and indirectly from other third parties, such as other servicers, lenders, and consumer reporting agencies:



13.    For an undisclosed period of time, SNSC's insecure computer systems were being surreptitiously probed, accessed, and data copied without authorization or detection by cybercriminals using ransomware.[1]

14.    Ransomware gets its name from the type of scheme employed by the criminals that use it. The malware program encrypts sensitive files and data, locking the owner out of its data. The criminals demand a ransom payment from the targeted business in exchange for the encryption key. Often, as in the case with the ransomware attacker here, the demand is accompanied by the threat of leaking the files to the public. Furthermore, ransomware hackers typically execute the ransomware after being satisfied that they probed the entirety of the target's systems and have accessed, copied, and stolen the most sensitive and valuable information maintained by the target.

15.    SNSC's letter of January 14, 2021 ("Notice of Data Breach", the copy sent to Plaintiff is attached hereto as Exhibit B) claims that on or about October 15, 2020, a ransomware-threat-actor group

---

[1] https://www.bleepingcomputer.com/news/security/mount-locker-ransomware-joins-the-multi-million-dollar-ransom-game/; https://healthitsecurity.com/news/mount-locker-ransomware-actors-claim-sonoma-valley-hospital-attack (both last visited May 25, 2021).

known as "Mount Locker" deployed ransomware into SNSC's environment and successfully exfiltrated a number of digital files maintained by SNSC.[2]

16.     As of February 5, 2021, the SNSC Data Breach was listed as "Coming Soon" on the leak site of a different ransomware enterprise known as Egregor, in its Hall of Shame section reserved for companies that have refused to pay the ransom.[3]

17.     Because SNSC failed to securely maintain the personal and financial information of Plaintiff and other Class members, criminals were able to rifle through SNSC's networks undetected, exfiltrate a large amount of personal and financial information without resistance, and then lock SNSC out of its systems in exchange for a demanded ransom.

18.     As a result of SNSC's actions and inactions, the personal and financial information of at least 170,426 individuals were stolen and held for ransom.

19.     Even though SNSC learned of the Data Breach and alerted the Federal Bureau of Investigation almost immediately, SNSC did not warn Plaintiff and Class members until January 14, 2021. This delay was unjustified and inexplicable.

20.     The Notice of Data Breach states that a preliminary investigation revealed that the borrower's personal and financial information was acquired by criminals in a ransomware attack. It also states that the data acquired by the criminals "may include, but is potentially not limited to: your name, address, loan numbers, balance information, and billing information such as charges assessed, owed and/or paid." *See* Exhibit B.

21.     The Notice of Data Breach stated that SNSC was "still in the process of conducting a comprehensive investigation of this incident and you will be notified in the event we discover that any additional nonpublic personal information or personally identifiable information pertaining to you was exposed." *See* Exhibit B. In a January 14, 2021, letter to the New Hampshire Attorney General, SNSC

---

[2] Plaintiff refers to the Notice of Data Breach for purposes of alleging what SNSC has claimed only. Other than the fact that the Data Breach occurred, no reference to the Notice of Data Breach in this Second Amended Complaint should be construed as accepting any statement made by SNSC (particularly self-serving statements) as allegations of fact.

[3] https://www.scmagazine.com/news/ransomware/mortgage-loan-servicing-company-discloses-ransomware-attack-to-multiple-states (last visited August 17, 2021).

represented that it hired a third-party e-discovery vendor to conduct a "data mining" review of the documents that were identified to have been exfiltrated to determine whether additional personal and financial information was compromised. At that time, SNSC also notified the Maine Attorney General that 20,155 individuals were victimized in the Data Breach.

22.     On information and belief, SNSC and its forensic investigators acting as its agents, purposefully limited the "preliminary investigation" to certain files, servers, or environments that SNSC knew did not store banking or payment card information, non-public information subject to regulatory oversight, or Social Security numbers, so that it could plausibly state in its Notice of Data Breach that it had not discovered such information was exposed, knowing that its initial notification would get the most attention and while knowing facts supporting a risk that a full investigation would reveal that more sensitive and damaging information was in fact exposed, accessed, stolen, and leaked.

23.     As a result, given that ransomware actors typically target and acquire to their satisfaction the most sensitive and valuable information from their mark before executing the ransomware, and considering SNSC's misleading statements and omissions in its untimely Notice of Data Breach, Plaintiff and Class members reasonably undertook steps to mitigate, reduce, and remedy the substantial risk that the ransomware attack accessed and stole the full spectrum of their personal and financial information, which includes Social Security numbers, financial account information, loan status, balance, and payment details, and other substantial credit, financial, and personal information relating to them, their home, home loan, and creditworthiness.

24.     Based on the Notice of Data Breach, Plaintiff was warned that, based on an incomplete preliminary investigation, certain details regarding her home loan and finances were compromised in a ransomware attack by a known group of hackers.

25.     SNSC collected, aggregated, digitized, and maintained significant financial and personal information pertaining to Plaintiff, including financial account information, name, address, contact information, and her Social Security number.

26.     SNSC advised Plaintiff that a more thorough investigation might reveal that additional information of hers was acquired, stolen, accessed, and leaked by a group of known hackers.

27.     SNSC failed to provide Plaintiff with an outlook regarding how the investigation would be conducted or when the investigation would be completed.

28.     SNSC advised Plaintiff to obtain credit reports, monitor her accounts for fraudulent activity, to check explanations of benefits, financial account statements, and the like for suspicious or unauthorized activities and charges, and to maintain vigilance against the threat of identity theft or fraud.

29.     As a result of the Data Breach, and as recommended by the Notice of Data Breach, Plaintiff and Class members have been and must continue to be vigilant and review their credit reports for incidents of identity theft, and educate themselves about security freezes, fraud alerts, and other steps to protect themselves against identity theft.

30.     Plaintiff's vigilance was vindicated. Consistent with the foregoing, SNSC provided a supplemental disclosure to certain Class members, on or around July 16, 2021, that starkly contrasts the rosy assessment in its preliminary investigation (which still took almost three months to complete for some reason). As of July 16, 2021, SNSC stated that names, contact information, dates of birth, Social Security numbers, and a vast category of information it identified vaguely as "loan/borrower information" had also been stolen in the Data Breach. *See* SNSC's Supplemental Data Breach Disclosure, attached hereto as Exhibit C.

31.     In addition, SNSC updated the number of impacted persons to 170,426 in its disclosures to the Maine Attorney General, and also updated its disclosure of the types of information that was stolen in the Data Breach to include financial account numbers or debit/credit card numbers in combination with the security codes, access codes, passwords, and PINs for the accounts. Plaintiff believes, and on that basis alleges, that such information pertaining to her and the members of the Class was likewise disclosed.

### SNSC Breached Duties of Care and Committed Unfair Acts

32.     SNSC's failure to adhere to reasonable and necessary industry standards, including Regulations and Guidance and Enforcement Policies of the Federal Trade Commission ("FTC"), resulted in the Data Breach and exacerbated its scope and impact.

33.     SNSC failed to create, implement, and maintain adequate safeguards for the online storage of personal and financial information of Plaintiff and Class members, resulting in the Data Breach.

34.     Because of its failure to create, maintain, and/or comply with necessary cybersecurity requirements, SNSC was unable to protect Plaintiff's and Class members' information and confidentiality, and protect against obvious and readily foreseeable threats to information security and confidentiality or the unauthorized access to Plaintiff's and Class members' personal and financial information, resulting in the Data Breach.

35.     As the Notice of Data Breach reveals, only after the ransomware attack was successful did SNSC begin (if at all) to undertake the basic steps recognized in the industry to protect Plaintiff's and Class members' personal and financial information to bolster its cybersecurity posture by replacing email filtering tools, malware software, and Internet monitoring tools with more robust solutions that utilize AI to detect and block known and newly introduced malware, and block all inbound and outbound Internet, email, and network traffic to foreign countries. *See* Exhibit B.

36.     Security standards commonly accepted among businesses that store personal and financial information using the Internet include, without limitation:

- Maintaining a secure firewall configuration;
- Monitoring for suspicious or irregular traffic to servers;
- Monitoring for suspicious credentials used to access servers;
- Monitoring for suspicious or irregular activity by known users;
- Monitoring for suspicious or unknown users;
- Monitoring for suspicious or irregular server requests;
- Monitoring for server requests for personal and financial information;
- Monitoring for server requests from VPNs; and
- Monitoring for server requests from Tor exit nodes.

37.     The FTC publishes guides for businesses for cybersecurity and protection of personal and financial information which includes basic security standards applicable to all types of businesses.

38.     To comply with the FTC's standards, businesses must:

- Identify all connections to the computers where you store sensitive information;
- Assess the vulnerability of each connection to commonly known or reasonably

8

foreseeable attacks;

- Do not store sensitive consumer data on any computer with an internet connection unless it is essential for conducting their business;

- Scan computers on their network to identify and profile the operating system and open network services. If services are not needed, they should be disabled to prevent hacks or other potential security problems. For example, if email service or an internet connection is not necessary on a certain computer, a business should consider closing the ports to those services on that computer to prevent unauthorized access to that machine;

- Pay particular attention to the security of their web applications—the software used to give information to visitors to their websites and to retrieve information from them. Web applications may be particularly vulnerable to a variety of hack attacks;

- Use a firewall to protect their computers from hacker attacks while it is connected to a network, especially the internet;

- Determine whether a border firewall should be installed where the business's network connects to the internet. A border firewall separates the network from the internet and may prevent an attacker from gaining access to a computer on the network where sensitive information is stored. Set access controls—settings that determine which devices and traffic get through the firewall—to allow only trusted devices with a legitimate business need to access the network. Since the protection a firewall provides is only as effective as its access controls, they should be reviewed periodically;

- Monitor incoming traffic for signs that someone is trying to hack in. Keep an eye out for activity from new users, multiple log-in attempts from unknown users or computers, and higher-than-average traffic at unusual times of the day; and

- Monitor outgoing traffic for signs of a data breach. Watch for unexpectedly large amounts of data being transmitted from their system to an unknown user. If large amounts of information are being transmitted from a business' network, the transmission should be investigated to make sure it is authorized.

39.     The FTC has brought enforcement actions against businesses for failing to adequately and

reasonably protect customer information, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

40.     Because SNSC was entrusted with consumers' personal and financial information, it had, and has, a duty to those whose loans it services, including Plaintiff and Class members, to keep their personal and financial information secure.

41.     Plaintiff and Class members reasonably expect that when they provide their personal and financial information to a company, the company will safeguard their personal and financial information.

42.     Nonetheless, SNSC failed to upgrade and maintain its data security systems in a meaningful way so as to prevent the Data Breach described below.

43.     Specifically, in breach of its duties, SNSC failed to:

- Replace email filtering tools, malware software, and Internet monitoring tools with more robust solutions that utilize artificial intelligence ("AI") to detect and block known and newly introduced malware;

- Block all inbound and outbound Internet, email, and network traffic to foreign countries;

- Maintain a secure firewall configuration;

- Monitor for suspicious or irregular traffic to servers;

- Monitor for suspicious credentials used to access servers;

- Monitor for suspicious or irregular activity by known users;

- Monitor for suspicious or unknown users;

- Monitor for suspicious or irregular server requests;

- Monitor for server requests for personal and financial information;

- Monitor for server requests from VPNs;

- Monitor for server requests from Tor exit nodes;

- Identify all connections to the computers where Defendant stores sensitive information;

- Assess the vulnerability of each connection to commonly known or reasonably foreseeable attacks;

- Scan computers on Defendant's network to identify and profile the operating system and open network services, and disable services that are not needed to prevent hacks or other potential security problems;

- Pay particular attention to the security of Defendant's web applications—the software used to give information to visitors to its websites and to retrieve information from them;

- Use a firewall to protect Defendant's computers from hacker attacks while it is connected to a network, especially the Internet;

- Determine whether a border firewall should be installed where Defendant's network connects to the Internet;

- Monitor incoming traffic for signs that someone is trying to hack in; and

- Monitor outgoing traffic for signs of a data breach.

44. Had SNSC properly maintained its systems and adequately protected Plaintiff's and Class members' information, it could have prevented the Data Breach.

45. In addition, SNSC negligently and willfully kept the facts of the Data Breach hidden from Plaintiff and Class members when there was no legitimate reason to do so. Because of the nature of ransomware attacks—that the hacker is in direct contact with the business and demanding a ransom—there is no investigative or other reason not to warn impacted victims as soon as possible. Furthermore, there is no legitimate reason to go to great lengths to comb through files to identify all the specific pieces of data that were and were not taken in the Data Breach. The duty to notify arises once there is reason to believe sensitive information is likely to have been compromised. SNSC should have notified all of its customers much sooner. Waiting until July 16, 2021, or even January 14, 2021, to warn people that their information has been in the hands of criminals since at least October 2020 was unconscionable.

46. Had SNSC provided reasonable and timely notification, the harms resulting from the Data

Breach could have been reduced or prevented altogether.

### *Damages From Data Breaches*

47.     According to Javelin Strategy & Research, in 2017 alone over 16.7 million individuals were affected by identity theft, causing $16.8 billion to be stolen.

48.     Consumers place a high value not only on their personal and financial information, but also on the privacy of that data. This is because identity theft causes "significant negative financial impact on victims" as well as severe distress and other strong emotions and physical reactions.

49.     The United States Government Accountability Office released a report in 2007 regarding data breaches ("GAO Report"). The GAO Report explains that "[t]he term 'identity theft' is broad and encompasses many types of criminal activities, including fraud on existing accounts—such as unauthorized use of a stolen credit card number—or fraudulent creation of new accounts—such as using stolen data to open a credit card account in someone else's name." *See In re Zappos.com, Inc.*, 888 F.3d 1020, 1024 (9th Cir. 2018) (quoting the GAO Report). The GAO Report notes that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."

50.     The FTC recommends that identity theft victims take several steps to protect their personal and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for 7 years if someone steals their identity), reviewing their credit reports often, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.

51.     Identity thieves use stolen personal and financial information for "various types of criminal activities, such as when personal and financial is used to commit fraud or other crimes," including "credit card fraud, phone or utilities fraud, bank fraud and government fraud." *In re Zappos.com, Inc.*, 888 F.3d at 1024. The information exfiltrated in the Data Breach can also be used to commit identity theft by placing Plaintiff and Class members at a higher risk of "phishing," "vishing," "smishing," and "pharming," which are which are ways for hackers to exploit information they already have to get even more personally identifying information through unsolicited email, text messages, and telephone calls purportedly from a legitimate company requesting personal, financial, and/or login credentials. Indeed, since October 2020

Plaintiff has experienced an increase in robotexts to her cell phone and has noticed that many involve what is believed to be a scam relating to home loan refinancing or purchasing her home.

52.     There may be a time lag between when harm occurs versus when it is discovered, and also between when personal and financial information is stolen and when it is used. According to the U.S. Government Accountability Office, which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.

*See* GAO Report, at p. 29.

53.     Personal and financial information is such a valuable commodity to identity thieves that once the information has been compromised, criminals often trade the information on the "cyber black-market" for years.

54.     Thus, there is a strong probability that entire batches of stolen information have been dumped on the black market, or are yet to be dumped on the black market, meaning Plaintiff and Class members are at an increased risk of fraud and identity theft for many years into the future.

55.     Data breaches are preventable.  As Lucy Thompson wrote in the DATA BREACH AND ENCRYPTION HANDBOOK, "In almost all cases, the data breaches that occurred could have been prevented by proper planning and the correct design and implementation of appropriate security solutions."  She added that "[o]rganizations that collect, use, store, and share sensitive personal data must accept responsibility for protecting the information and ensuring that it is not compromised . . . ."

56.     "Most of the reported data breaches are a result of lax security and the failure to create or enforce appropriate security policies, rules, and procedures. . . . Appropriate information security controls, including encryption, must be implemented and enforced in a rigorous and disciplined manner so that a data breach never occurs."

57.     The type of information SNSC acknowledges was stolen by the criminals is sufficiently

sensitive and valuable to identity thieves and criminals in perpetrating identity crimes. SNSC states that Plaintiff's name, address, loan numbers, billing history, and payment details were exposed. This information is immutable and can be used to perpetrate scams, victimize the persons who own the information, and commit identity theft and fraud.

58. The types of information compromised in the Data Breach are immutable. Plaintiff and Class members are not able to change them or simply cancel them, like a credit card, to avoid harm or fraudulent use of the information. Just like a birthdate or a mother's maiden name, these pieces of information cannot be changed by logging into a website and changing them in settings, and they can be used alone or in conjunction with other pieces of information to commit serious fraud.

59. Criminals can use the information to devise and employ phishing and social engineering schemes capitalizing on the genuine information stolen from SNSC to send fraudulent mail, emails, and other communications to Plaintiff and Class members that look authentic, but which are designed to lure them into paying money or providing other information that the criminals can use to steal money. For example, homeowners with trouble paying their loan payments may experience scams targeting them. According to Experian:[4]

> Mortgage Foreclosure Relief and Debt Management Scams
>
> In this type of mortgage fraud, scammers contact homeowners offering help if they can't make payments or may be falling behind on their mortgage (the primary contact is by phone with these). … Often they make promises of lower payments or making the payments for a homeowner in exchange for rent payments to their company. However, they don't actually make the mortgage payments and you may end up going into foreclosure anyway. Also known as foreclosure scams or foreclosure rescue schemes, this kind of fraud is unfortunately very common and can cost consumers a lot of money.

60. The information stolen in the Data Breach, by itself, can also be used by criminals to perpetrate fraud that will leave Plaintiff and Class members holding the bag. Experian explains that certain scams, including mortgage fraud, can be effectively perpetrated using only a name and loan number:[5]

---

[4] https://www.experian.com/blogs/ask-experian/heres-everything-you-need-to-know-about-the-risks-of-mortgage-fraud/ (last visited August 16, 2021).

[5] *Id.*

How Consumers Are Affected By Mortgage Fraud

Identity theft is a particularly threatening form of mortgage fraud, as it tends to lead directly toward homeowner financial loss. For example, if an identity thief steals a homeowner's Social Security number, or intercepts the mortgage account number, he or she can use that information to take out a home equity line of credit (also known as a HELOC) worth tens of thousands of dollars, in the homeowner's name.

61.     Experian explains how mortgage fraud impacts the homeowner. When the credit is provided to the fraudster:[6]

The cash is sent to a fraudulent account established by the thief, and the homeowner is left holding the bill. Or, the fraudster could take out a second mortgage using the homeowner's stolen data information, and escape with the cash, once again leaving the debt to the homeowner.

While any form of mortgage fraud is a serious offense, losing one's data to identity thieves can trigger a financial loss that's difficult to overcome, and that could take years to clear. Additional impacts include losing money, time, or missing out on the purchase of a dream home because you have to take additional time to deal with restoring your identity if you're the victim of mortgage fraud.

62.     Identity Force explains what a thief or scammer can do with sensitive information, such as loan information and identifying details, including stealing your home:[7]

Mortgaging Your Good Name

Mortgage fraud through identity theft is a very real risk. A thief can steal your Social Security number and other identifying details, then pretend to be you to a bank or mortgage broker. The criminal might refinance your home for more than what's owed and then take the extra cash or obtain a home equity line of credit and drain that account.

In some cases, you can experience house stealing through a fraudulent deed transfer. An identity thief could use stolen information to execute a transfer, which would put your property in his or her name. That means you'd legally no longer own that real estate. Since the criminal's name is on the deed, he

---

[6] *Id.*

[7] https://www.identityforce.com/blog/home-loan-identity-theft.

or she would have the right to take out loans against the house. With no payments made on those loans or the mortgage, the property could even go into foreclosure.

Thieves can get the information they need for these transactions by stealing your mail, getting personal details through fraudulent phone calls, or making copies of your driver's license to impersonate you. Unfortunately, sometimes it's friends and family who are the culprits (known as familiar fraud) since they may have access to files inside a home and often know many of the personal details required to impersonate you.

### *Plaintiff's Injuries*

63.     In 2004, Plaintiff took out a mortgage loan with Republic Bank for property in Cleveland, Ohio. SNSC now services the mortgage loan. Plaintiff and Class members provided their lenders, servicers, and SNSC with significant personal, income, and financial information that SNSC was able to acquire and to supplement by obtaining credit reports and banking information from third parties. Such information included, but is not limited to:

- Full name, mailing address, phone numbers, email address, and loan identification number;

- Co-borrower contact information, phone numbers, email address, and mailing address;

- Notations and comments concerning collections and loan servicing;

- Fee balance information;

- Information regarding insurance on the property and property details pertinent thereto;

- Loan history information, Social Security number, transaction dates, due dates, transaction amount, principal amount, end principal balance, interest, escrow amounts, check numbers, late charges, assistance amounts; details on loans in arrears;

- Tax information, including tax type, frequency, account number, and payee information;

- Credit information from consumer reports and files held by consumer reporting agencies; and

- Other information, but Plaintiff does not know the full extent of the information SNSC has relating to her.

64.     It is plausible to assume that the foregoing pieces of information relating to Plaintiff and Class members were exposed, compromised, accessed, viewed without authorization, and stolen in the

Data Breach by criminals.

65.     On January 14, 2021, SNSC sent Plaintiff the Notice of Data Breach notifying her that her personal and financial information relating to her home loan had been acquired by a ransomware criminal enterprise. According to the Notice of Data Breach, the criminals acquired, at the very least, Plaintiff's March 2018 billing statements and fee notices that contain her personal and financial information including, among other information, name, address, loan number, balance information, and billing information such as charges assessed, owed, and/or paid. The Notice of Data Breach further stated that SNSC is still in the process of conducting an investigation of the incident to determine if additional personal and financial information pertaining to Plaintiff was stolen and in the hands of criminals.

66.     The supposedly ongoing investigation revealed that names, contact information, dates of birth, Social Security numbers, and a vast category of information SNSC identified vaguely as "loan/borrower" information were also disclosed. Although Plaintiff did not herself receive the July letter from SNSC, she had already filed this lawsuit against SNSC when that letter was disseminated. Plaintiff had no reason to doubt, and every reason to assume, that her Social Security number, date of birth, and "loan/borrower" information, as well as all the other sensitive information of hers in SNSC's possession was also stolen and in the hands of criminals. She should not be required to wait indefinitely to learn the results of SNSC's secretive investigation before taking action to try to protect her identity.

67.     The Notice of Data Breach also provided Plaintiff with "steps you can take to protect your personal information." After explaining that Plaintiff's personal information was taken by criminals in a "ransomware attack," and explaining that a comprehensive investigation was in process, SNSC recommended that Plaintiff obtain credit monitoring protection, review account statements and immediately report any suspicious activity, and obtain credit reports from each nationwide credit reporting agency. The Notice of Data Breach also explained steps to take if any identity theft is identified. This recommendation by SNSC was not conditioned on the specific nature of the information it surrendered to the hackers. Whether the information exfiltrated for any specific person included addresses, loan numbers, billing information, Social Security numbers, etc., the advice given by SNSC to Plaintiff and Class members was that they should obtain credit monitoring protection and take the other proactive measures

to monitor and protect their identity, which Plaintiff reasonably did.

68. As a direct result of the Data Breach, the delayed Notice of Data Breach, and the recommendations of SNSC, Plaintiff purchased credit monitoring with Lifelock at an annual cost of more than $200.00, as well as LastPass password manager, which is a monthly password manager and password vault application subscription service that costs $3.00 per month, and YubiKey password protection at a cost of more than $90.00.

69. As a direct result of the Data Breach and the delayed Notice of Data Breach, Plaintiff has spent time and energy protecting and monitoring her identity and credit, spent at least four hours reviewing bank accounts and statements, spent at least 10 hours changing hundreds of passwords related to her business and personal accounts, and she will have to spend additional time and energy in the future continuing to monitor and protect her identity and credit. As a direct result of the Data Breach, Plaintiff has suffered anxiety, emotional distress, and loss of privacy.

70. As a direct result of the Data Breach and delayed Notice of Data Breach, Plaintiff has begun to experience an increase in spam, phishing attempts, and social engineering. She receives and is unable to stop repeated robotexts to her cell phone from spoofed phone numbers offering to buy her home in what she believes is a scam. She has not responded to any of these text messages.

### Plaintiff's and Class Members' Damages

71. As a direct and proximate result of SNSC's conduct, Plaintiff and Class members have been placed at an imminent, immediate, and continuing increased risk of harm from fraud and identity theft.

72. Plaintiff and members of the Class have or will suffer actual injury as a direct result of the Data Breach including:

    a) Spending time reviewing finding fraudulent charges and remedying fraudulent charges;

    b) Purchasing credit monitoring and identity theft prevention;

    c) Time and money addressing and remedying identity theft;

    d) Spending time placing "freezes" and "alerts" with credit reporting agencies and,

subsequently, temporarily lifting a security freeze on a credit report, or removing a security freeze from a credit report;

e)   Spending time on the phone with or visiting financial institutions to dispute fraudulent charges;

f)   Contacting their financial institutions and closing or modifying financial accounts compromised as a result of the Data Breach; and

g)   Closely reviewing and monitoring bank accounts and credit reports for unauthorized activity for years to come.

73.   Moreover, Plaintiff and Class members have an interest in ensuring that their personal and financial information is protected from further breaches by the implementation of security measures and safeguards, including making sure that the storage of data containing their personal and financial information is secure.

74.   As a direct and proximate result of SNSC's actions and inactions, Plaintiff and Class members have suffered anxiety, emotional distress, and loss of privacy.

75.   As a direct and proximate result of SNSC's actions and inactions, Plaintiff and Class members are faced with an increased and immediate risk of future harm, including from identity theft and fraud related to their financial accounts.

76.   As a result of the Data Breach, Plaintiff and Class members are at an imminent risk of identity theft and fraud. This risk will continue to exist for years to come, as Plaintiff and Class members must spend their time being extra vigilant, due to Defendant's failures, to try to prevent being victimized for the rest of their lives.

77.   Because Defendant presented such an easy target to cyber criminals, Plaintiff and Class members have already been subjected to violations of their privacy, and have been exposed to a heightened and imminent risk of fraud and identity theft. Plaintiff and Class members must now and in the future, spend time to more closely monitor their financial accounts to guard against identity theft and other fraud.

78.   Plaintiff and Class members may also incur out-of-pocket costs for, among other things, purchasing credit monitoring services or other protective measures to deter and detect identity theft.

1

*Application of California Law to*
*The Claims of Plaintiff and the Class*

2

79.     California has a significant interest in regulating the conduct of businesses operating within its borders. California seeks to protect the rights and interests of all California residents and citizens of the United States against a company with its principal place of business in California. California has a greater interest in the claims of Plaintiff and members of the Class than any other state, and is most intimately concerned with the claims and outcome of this litigation.

80.     The principal place of business of SNSC, located in Eureka, California, is the "nerve center" of its business activities – the place where its high-level officers direct, control, and coordinate the company's activities, including its data security functions and policy, financial, and legal decisions.

81.     As indicated by the Notice of Data Breach, SNSC's response to the Data Breach at issue here, and corporate decisions surrounding such response, were made from and in California.

82.     SNSC's breaches of duty to Plaintiff and Class members emanated from California.

83.     Application of California law to the Class with respect to Plaintiff's and Class members' claims is neither arbitrary nor fundamentally unfair because California has significant contacts and a significant aggregation of contacts that create a state interest in the claims of Plaintiff and the Class.

84.     Under California's choice of law principles, the common law of California applies to the common law claims of all Class members. Additionally, given California's significant interest in regulating the conduct of businesses operating within its borders, California's Unfair Competition Law may be applied to non-resident consumer Plaintiff as against this resident-defendant. Further, SNSC's Terms and Conditions include a venue provision selecting venue within the City and County of San Francisco, California, as well as a choice-of-law provision selecting the laws of the State of California, without giving effect to conflict of laws provisions.

## CLASS ALLEGATIONS

85.     Class Definition: Plaintiff bring this action pursuant to Fed. R. Civ. P. 23(b)(2) and (b)(3) on behalf of a class of similarly situated individuals and entities ("the Class"), defined as follows:

> All persons whose personal and financial information was compromised in the Data Breach.

Excluded from the Class are: (1) Defendant, Defendant's agents, subsidiaries, parents, successors, predecessors, and any entity in which Defendant or its parents have a controlling interest, and those entities' current and former employees, officers, and directors; (2) the Judge to whom this case is assigned and the Judge's immediate family; (3) any person who executes and files a timely request for exclusion from the Class; (4) any persons who have had their claims in this matter finally adjudicated and/or otherwise released; and (5) the legal representatives, successors and assigns of any such excluded person.

86.     Numerosity: According to information provided by SNSC to the Maine Attorney General, the personal and financial information of 170,426 people was stolen in the Data Breach. Thus, the Class is so numerous that joinder of all members is impracticable. Class members can easily be identified through records of the SNSC, or by other means.

87.     Commonality and Predominance: There are several questions of law and fact common to the claims of Plaintiff and Class members, which predominate over any individual issues, including:

a)      Whether SNSC stored Plaintiff's and Class members' personal and financial information without adequate security and protections;

b)      Whether SNSC adopted, implemented, and maintained reasonable safeguards to prevent the unauthorized access to the personal and financial information of Plaintiff and members of the Class;

c)      Whether SNSC failed to notify Plaintiff and members of the Class about the Data Breach expeditiously and without unreasonable delay after the Data Breach was discovered;

d)      Whether SNSC owed a duty to Plaintiff and members of the Class to safeguard and protect their personal and financial information;

e)      Whether SNSC breached a duty to Plaintiff and members of the Class to safeguard and protect their personal and financial information;

f)      Whether SNSC breached a duty to Plaintiff and members of the Class by failing to adopt, implement, and maintain reasonable safeguards to protect the personal and financial information of Plaintiff and members of the Class; and

g)      Whether SNSC is liable for the damages suffered by Plaintiff and members of the

Class as a result of the Data Breach.

88.     Typicality: Plaintiff's claims are typical of the claims of members of the Class. All claims are based on the same legal and factual issues. The personal and financial information of Plaintiff and each of the Class members was exfiltrated by criminals in the Data Breach. Defendant's actions and inactions in storing the information was uniform to Plaintiff and all Class members.

89.     Adequacy of Representation: Plaintiff will fairly and adequately represent and protect the interests of the members of the Class and has retained counsel competent and experienced in complex class actions. Plaintiff has no interests antagonistic to those of any members of the Class, and Defendant has no defenses unique to Plaintiff.  The questions of law and fact common to the proposed Class predominate over any questions affecting only individual members of the Class.

90.     Superiority: A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  The expense and burden of individual litigation would make it impracticable or impossible for proposed members of the Class to prosecute their claims individually. The trial and the litigation of Plaintiff's claims are manageable.

### COUNT I
**Negligence**
**(On behalf of Plaintiff and the Class)**

91.     Plaintiff repeats and realleges the allegations in paragraphs 1–90 with the same force and effect as if fully set forth herein.

92.     SNSC's actions and inactions were of the type that would result in foreseeable, unreasonable risk of harm to Plaintiff and Class members. SNSC knew, or should have known, of the risks inherent in collecting and storing the personal and financial information of Plaintiff and Class members and the importance of adequate security in storing the information. Additionally, SNSC was well aware of numerous, well-publicized data breaches that exposed the personal and financial information of individuals.

93.     SNSC had a common law duty to establish and maintain reasonable security to protect the personal and financial information of Plaintiff and Class members. This duty existed because Plaintiff and Class members were the foreseeable and probable victims of the failure of SNSC to adopt, implement,

and maintain reasonable security measures so that Plaintiff's and Class members' personal and financial information would not be unsecured and accessible by unauthorized persons.

94.     SNSC's collection, creation, digitization, aggregation, and maintenance of Plaintiff's and Class members' personal information created a peril to Plaintiff and Class members from which common law duties arise. These duties include implementation of reasonable procedures and practices to safely and securely store, maintain, and handle the information; and to provide timely, clear, and full disclosure to Plaintiff and Class members of material events impacting the integrity and security of the information that pertains to them.

95.     Because SNSC's unreasonable conduct in connection with the collection, creation, digitization, aggregation, maintenance, and handling of Plaintiff's and Class members' information placed them in peril, the general duty of care codified in Cal. Civ. Code § 1714 to act reasonably under the circumstances applies.

96.     Numerous aspects of the relationship between SNSC and those persons whose loans SNSC services support a duty of care under California law, as follows:

• Their relationship has an aspect of dependency in which one party relies to some degree on the other for protection. *Regents of Univ. of Cal. v. Superior Court*, 4 Cal. 5th 607, 621 (2018). Here, Plaintiff and Class members had to rely entirely on SNSC to protect their personal and financial information in SNSC's possession. SNSC collects, creates, digitizes, aggregates, stores, and handles Plaintiff's and Class members' information, and SNSC's procedures are entirely hidden from their review or oversight. Much of this information is collected from third parties, such as lenders, prior servicers, and consumer reporting agencies. Because SNSC is a loan servicer for Plaintiff's and Class members' lenders, Plaintiff and Class members have no practical or effective way to control or limit SNSC's conduct. SNSC stores the information on systems and servers that it exclusively owns or controls. Plaintiff and Class members are dependent on SNSC for the protection of their personal and financial information, and SNSC has superior control over the means of protection.

• SNSC's duties to protect personal and financial information have defined boundaries. *Regents of Univ. of Cal. v. Superior Court*, 4 Cal. 5th 607, 621 (2018). SNSC's duties extend

only to those persons whose information SNSC collects and from whom it profits—*i.e.*, Plaintiff and Class members. The duty of care is owed to a limited community, not the public at large. SNSC has the means to control the scope of the duty and SNSC's profits are proportional to the scope of the duty. The more loans SNSC services, the more SNSC is compensated. The scope of the duty is clearly defined and within SNSC's exclusive control.

- The relationship between SNSC and Plaintiff and Class members benefited SNSC. SNSC profited by performing services in connection with the storage and handling of Plaintiff's and Class members' personal and financial information. SNSC was also able to realize short term benefits and cost reductions by failing to implement reasonable data security practices. Without any legal obligation, SNSC has no economic incentive to provide reasonable data security for Plaintiff's and Class members' personal and financial information. The law should recognize a duty to provide reasonable data security to prevent harms to Plaintiff and Class members, which are more fully described below.

97. For largely the same reasons, SNSC also owes a duty of care to provide reasonable, timely, and appropriate disclosures of material events impacting Plaintiff's and Class members' personal and financial information.

98. In addition, consideration of the factors set forth by the California Supreme Court in *Rowland v. Christian*, 69 Cal. 2d 108 (1968), counsel in favor of finding such a duty of care based on a special relationship between SNSC and Plaintiff and Class members.

99. However, the California Supreme Court has identified several factors that may, on balance, justify excusing or limiting a defendant's duty of care. These include: "the foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved." *See Regents of Univ. of Cal. v. Superior Court*, 4 Cal. 5th 607, 628 (2018) (citing *Rowland*, 69 Cal. 2d 108 (1968)). Analysis of these factors supports a duty of care here, specifically:

- The harm to Plaintiff and Class members was foreseeable. Large financial services companies are in the crosshairs of hackers because of the vast amounts of data they store, the way they organize it, the highly sensitive nature of the information, and the way the information can be used unlawfully to obtain money and other benefits. Cases involving data breaches to businesses in general and to financial services companies in particular have so held. *See, e.g.*, *In re Equifax, Inc., Customer Data Sec. Breach Litig.*, 362 F. Supp. 3d 1295, 1326 (N.D. Ga. 2019) ("under traditional negligence principles, the Defendants owed a legal duty to the Plaintiff to take reasonable precautions due to the reasonably foreseeable risk of danger of a data breach incident").

- Plaintiff and Class members certainly suffered harm. The risks and harms of victims of data breaches are well documented and have been recognized by courts across the country and in California. *In re Anthem, Inc., Data Breach Litig.*, 162 F. Supp. 2d 953, 988 (N.D. Cal. Feb. 14, 2016). Here, Plaintiff incurred out of pocket expenses and spent time and energy to mitigate and remediate the known risks presented by the Data Breach, and Plaintiff started receiving spoofed messages after the Data Breach demonstrating that she is a victim of identity theft. Many aspects of the information stolen or compromised in the Data Breach are immutable. For example, Plaintiff and Class members cannot change on their own, or only at great expense, their loan IDs, Social Security numbers, contact information, and property information. The details of the loan status, balance, payment history, and notes on the loans are matters of historical fact that can never be changed.

- The connection between SNSC's conduct to Plaintiff's injuries are close. Indeed, Plaintiff incurred the very expenses and spent time doing the very tasks SNSC urged her to do. As set forth above, Plaintiff started receiving spoofed messages after the Data Breach demonstrating that she is a victim of identity theft. SNSC's acts and omissions causing the Data Breach and SNSC's subsequent untimely, misleading, and inadequate notification are the direct cause of Plaintiff's and Class members' injuries.

- SNSC's unilateral acts and omissions in implementing inadequate and unreasonable data security (which SNSC says it apparently cured "immediately" after the Data Breach) are morally blameworthy. So too are SNSC's misleading, self-serving notification statements that did

nothing but obfuscate the real risk that Plaintiff and Class members faced months after Plaintiff and Class members should have been notified. SNSC has exclusive control over the systems it uses to store Plaintiff's and Class members' immutable personal and financial information, and SNSC profits from its use of that information. SNSC knows that it is a likely target of hackers, due to the sensitive nature of the information that it stores. SNSC knows Plaintiff and Class members will suffer permanent harm if their personal and financial information is stolen from SNSC by hackers. SNSC knew or should have known that its data security was insufficient, but SNSC did nothing to correct it until after the Data Breach occurred. In light of all of this, great moral blame attaches to SNSC's acts and omissions.

•       The policy of preventing future harm supports a duty of care. SNSC could easily have corrected its data security deficiencies prior to the Data Breach—like SNSC did after the Data Breach—but SNSC failed to do so, likely because SNSC did not want to spend the money to make the corrections. Only by imposing a duty on businesses like SNSC can the well-documented harms impacting data breach victims be prevented.

•       The extent of the burden to SNSC and consequences to the community of imposing a duty to exercise care with resulting liability for breach support a duty. There is a slight burden on SNSC to maintain adequate data security as required by law, and there are no negative consequences to the community by imposing such a burden on SNSC. To the contrary, there are grave consequences to the community if a duty of care is *not* imposed on SNSC, as individuals will suffer permanent identity theft and the consequential damages that result therefrom, and businesses will be faced with fraudulent claims by hackers using the stolen information.

•       The availability, cost, and prevalence of insurance for the risk involved demands a duty. Cybersecurity insurance is available and widely used by companies. Upon information and belief, SNSC has such insurance.

100.    SNSC had a special relationship with Plaintiff and Class members. SNSC was entrusted with Plaintiff's and Class members' personal and financial information, and SNSC was in a position to protect the personal and financial information from unauthorized access.

101.    As a mortgage loan servicer SNSC is not chosen by the borrower to service loans or to

safeguard the borrower's personal information. SNSC is chosen by the borrower's lender. A borrower whose loan is serviced by SNSC is a captive customer of SNSC. Borrowers do not have the opportunity to move their account to a different mortgage loan servicer because of concerns about SNSC's ability to protect their private and sensitive personal financial information.

102.     The duties of SNSC also arose under section 5 of the FTC Act, which prohibits "unfair...practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect individuals' personal and financial information by companies. Various FTC publications and data security breach orders further form the basis of the duties of SNSC.

103.     SNSC had a duty to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting Plaintiff's and Class members' personal and financial information in its possession so that the personal and financial information would not come within the possession, access, or control of unauthorized persons. More specifically, the duties of SNSC included, among other things, the duty to:

a)     Adopt, implement, and maintain adequate security measures for protecting Plaintiff's and Class members' personal and financial information to ensure that the information is not accessible online by unauthorized persons or stolen in bulk in a data breach;

b)     Adopt, implement, and maintain processes to quickly detect a data breach and to promptly act on warnings about data breaches, and notify affected persons without unreasonable delay;

c)     Adopt, implement, and maintain procedures for timely and clear disclosures relating to material events impacting Plaintiff's and Class members' personal and financial information to allow them to take reasonable precautions and steps to protect themselves within the small window of time that such acts are most effective and advantageous.

104.     SNSC breached the foregoing duties to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting Plaintiff's and Class members' personal and financial information in its possession so that the information would not come within the possession, access, or control of unauthorized persons.

105.     SNSC acted with reckless disregard for the security of the personal and financial information of Plaintiff and the Class because SNSC knew or should have known that its data security was not adequate to safeguard the personal and financial information that SNSC collected and stored.

106.     SNSC acted with reckless disregard for the rights of Plaintiff and Class members by failing to promptly detect the Data Breach, and further, by failing to notify Plaintiff and Class members of the Data Breach in the most expedient time possible and without unreasonable delay, so that Plaintiff and Class members could promptly take measures to protect themselves from the consequences of the unauthorized access to their personal and financial information compromised in the Data Breach.

107.     SNSC acted with reckless and intentional disregard for the rights of Plaintiff and Class members by slow-rolling its investigation. Even though SNSC was aware of the ransomware attack on October 15, 2020, it did not disclose anything about the Data Breach to Plaintiff and Class members until January 14, 2021. It further waited until July 16, 2021 to correct this preliminary notice with material facts establishing that the claims in its January 14, 2021 notice were false, including that, contrary to SNSC's earlier representations, the Data Breach was *not* limited to one month's billing statements and also that Social Security numbers were, in fact, stolen.

108.     Significant data analysis taking almost 9 months was simply unnecessary. The 9 months SNSC and supposed professionals took to conduct the investigation and data analysis was dilatory. SNSC should have sent a data breach notification letter to Plaintiff and Class members as soon as it had alerted the FBI in October, 2020.

109.     As a result of the conduct of SNSC, Plaintiff and Class members have suffered and will continue to suffer foreseeable harm. Plaintiff and Class members have suffered actual damages including, but not limited to, imminent risk of identity theft; expenses and/or time spent on credit monitoring for a period of years; time spent scrutinizing bank statements, credit card statements, and credit reports; time spent initiating fraud alerts and credit freezes and subsequently temporarily lifting credit freezes; and increased risk of future harm. Further, Plaintiff and Class members have suffered and will continue to suffer other forms of injury and/or harm including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and non-economic losses. Class members are also at the mercy of SNSC for

the implementation of future measures to protect their data security, and they deserve to have transparent and accountable measures taken to protect that data from future cyberattacks.

WHEREFORE, Plaintiff and Class members pray for judgment as set forth below.

### COUNT II
### Unfair Competition Law, Bus. & Prof. Code § 17200, *et seq.*
### (On Behalf of Plaintiff and the Class)

110.    Plaintiff repeats and realleges the allegations in paragraphs 1–90 with the same force and effect as if fully set forth herein.

111.    SNSC has violated Business and Professions Code §17200, *et seq*. with respect to servicing Plaintiff's and Class members' mortgage loans and collecting and storing Plaintiff's and Class members' personal and financial information by engaging in unlawful, unfair or fraudulent business acts and practices and unfair, deceptive, untrue or misleading advertising that constitute acts of "unfair competition" as defined in Cal. Bus. Prof. Code § 17200. Defendant's malfeasance and misfeasance violated established public policy. It is the established public policy of this state that confidential information entrusted to financial institutions, such as Defendant, be adequately protected from outside intrusions. This public policy is expressed throughout state and federal laws, such as 15. U.S.C. § 45, Civil Code § 1798.81.5, and Cal. Const. Art I, § 1, There is no sufficient countervailing interest to support the Defendant's failure to take the necessary steps to protect Plaintiff's and Class members' confidential personal and financial information. Defendant's actions and inactions were immoral, unethical, oppressive, unscrupulous, unconscionable and/or substantially injurious to Plaintiff and Class members in the following ways:

a)    Failing to establish adequate security practices and procedures for maintaining and storing Plaintiff's and Class members' personal and financial information, and storing Plaintiff's and Class members' personal and financial information in an unsecure electronic environment. These unfair acts and practices were immoral, unethical, oppressive, unscrupulous, unconscionable, and/or substantially injurious to Plaintiff and Class members. SNSC's practices were contrary to legislatively declared and public policies that seek to protect consumer data and ensure that entities who solicit or are entrusted with personal and financial data utilize appropriate security measures, as reflected by laws like 15 U.S.C. § 45

and Cal. Civ. Code § 1798.81.5. The harm these practices caused to Plaintiff and Class members outweighed their utility;

b)    Collecting Plaintiff's and Class members' personal and financial information with knowledge that the information would not be adequately protected, and storing Plaintiff's and Class members' personal and financial information in an unsecure electronic environment;

c)    Representing that SNSC would protect Plaintiff's and Class members' personal and financial information from unauthorized access and use by using security measures that comply with federal law, and omitting, suppressing, and concealing the material fact of the inadequacy of the privacy and security protections.

112.    Plaintiff and Class members may maintain an Unfair Competition Law ("UCL") claim based on conduct declared unlawful under the FTC Act, 15 U.S.C § 45, *et seq.*, and FTC regulations, guidance, and decisions. *See Rubenstein v. Neiman Marcus Grp. LLC*, 687 Fed. Appx. 564, 567 (9th Cir. 2017) (quoting *Davis v. HSBC Bank Nev., N.A.*, 691 F.3d 1152, 1168 (9th Cir. 2012)) ("[A]lthough the FTC Guides do not provide a private civil right of action, "[v]irtually any state, federal or local law can serve as the predicate for an action under [the UCL.]"). Consistent with this Ninth Circuit authority, in *In re Anthem, Inc. Data Breach Litig.*, 162 F. Supp. 3d 953, 989 (N.D. Cal. 2016), Judge Koh held correctly that a UCL claim may be based on a violation of the FTC Act. Just as the allegations in *Rubenstein* and *Anthem* were sufficient to state a claim under the unlawful prong of the UCL, so do Plaintiff's allegations.

113.    "Section 5 of the FTC Act [15 U.S.C. § 45] is a statute that creates enforceable duties, and this duty is ascertainable as it relates to data breach cases based on the text of the statute and a body of precedent interpreting the statute and applying it to the data beach context." *In re Capital One Consumer Data Sec. Breach Litig.*, 488 F. Supp. 3d 374, 407 (E.D. Va. 2020). "For example, in *F.T.C. v. Wyndham Worldwide Corp.*, 799 F.3d 236, 240 (3d Cir. 2015), the United States Court of Appeals for the Third Circuit affirmed the FTC's enforcement of Section 5 of the FTC Act in data breach cases." *Capital One Data Security Breach Litigation*, 488 F. Supp. 3d at 407; *see also id.* at 420 (finding that alleged violations of Section 5 of the FTC Act stated a claim for violation of the unlawful prong of the UCL).

114.    In addition, Plaintiff and Class members may maintain a UCL claim based on conduct

declared unlawful under the Safeguards Rule, 16 C.F.R. part 314, promulgated by the FTC pursuant to authority delegated by Congress under the Gramm-Leach-Bliley Act, 15 U.S.C. § 6801(b), to establish standards for financial institutions relating to administrative, technical, and physical safeguards for nonpublic information, including Plaintiff's and Class members' personal and financial information.

115.    16 C.F.R. § 314.4 provides:

In order to develop, implement, and maintain your information security program, [a financial institution] shall:

(a)    Designate an employee or employees to coordinate your information security program.

(b)    Identify reasonably foreseeable internal and external risks to the security, confidentiality, and integrity of customer information that could result in the unauthorized disclosure, misuse, alteration, destruction or other compromise of such information, and assess the sufficiency of any safeguards in place to control these risks. At a minimum, such a risk assessment should include consideration of risks in each relevant area of your operations, including:

(1)    Employee training and management;

(2)    Information systems, including network and software design, as well as information processing, storage, transmission and disposal; and

(3)    Detecting, preventing and responding to attacks, intrusions, or other systems failures.

(c)    Design and implement information safeguards to control the risks you identify through risk assessment, and regularly test or otherwise monitor the effectiveness of the safeguards' key controls, systems, and procedures.

(d)    Oversee service providers, by:

(1)     Taking reasonable steps to select and retain service providers that are capable of maintaining appropriate safeguards for the customer information at issue; and

(2)     Requiring your service providers by contract to implement and maintain such safeguards.

(e)     Evaluate and adjust your information security program in light of the results of the testing and monitoring required by paragraph (c) of this section; any material changes to your operations or business arrangements; or any other circumstances that you know or have reason to know may have a material impact on your information security program.

16 C.F.R. § 314.4.

116.   The Safeguards Rule is a process-based rule drafted using intentionally broad language and not incorporating any specific information security standard or framework to provide financial institutions with the flexibility to "shape the information security programs to their particular business and to allow the programs to adapt to changes in technology and threats to the security and integrity of customer information."[8]

117.   SNSC was and is a financial institution.

118.   Plaintiffs' and Class members' nonpublic personal information was and is customer information.

119.   SNSC committed unlawful acts under the UCL by failing to comply with the requirements of the Safeguards Rule, including but not limited to, failing to:

• Upgrade and maintain its data security systems in a meaningful way so as to prevent the Data Breach;

• Replace email filtering tools, malware software, and Internet monitoring tools with

---

[8] Fed. Trade Comm'n, Standards for Safeguarding Customer Information, 84 Fed. Reg. 13158, 13159 (Apr. 4, 2019), also available at https://www.federalregister.gov/documents/2019/04/04/2019-04981/standards-for-safeguarding-customer- information (last visited Nov. 16, 2021).

more robust solutions that utilize artificial intelligence ("AI") to detect and block known and newly introduced malware;

- Block all inbound and outbound Internet, email, and network traffic to foreign countries;

- Maintain a secure firewall configuration;

- Monitor for suspicious or irregular traffic to servers;

- Monitor for suspicious credentials used to access servers;

- Monitor for suspicious or irregular activity by known users;

- Monitor for suspicious or unknown users;

- Monitor for suspicious or irregular server requests;

- Monitor for server requests for personal and financial information;

- Monitor for server requests from VPNs;

- Monitor for server requests from Tor exit nodes;

- Identify all connections to the computers where Defendant stores sensitive information;

- Assess the vulnerability of each connection to commonly known or reasonably foreseeable attacks;

- Scan computers on Defendant's network to identify and profile the operating system and open network services, and disable services that are not needed to prevent hacks or other potential security problems;

- Pay particular attention to the security of Defendant's web applications—the software used to give information to visitors to its websites and to retrieve information from them;

- Use a firewall to protect Defendant's computers from hacker attacks while it is connected to a network, especially the Internet;

- Determine whether a border firewall should be installed where Defendant's network connects to the Internet;

- Monitor incoming traffic for signs that someone is trying to hack in;

1      •     Monitor outgoing traffic for signs of a data breach;

2      •     Identify all connections to the computers where you store sensitive information;

3      •     Assess the vulnerability of each connection to commonly known or reasonably
4 foreseeable attacks;

5      •     Not store sensitive consumer data on any computer with an internet connection
6 unless it is essential for conducting their business;

7      •     Scan computers on their network to identify and profile the operating system and
8 open network services. If services are not needed, they should be disabled to prevent hacks or other
9 potential security problems. For example, if email service or an internet connection is not necessary on a
10 certain computer, a business should consider closing the ports to those services on that computer to prevent
11 unauthorized access to that machine;

12      •     Pay particular attention to the security of their web applications—the software used
13 to give information to visitors to their websites and to retrieve information from them. Web applications
14 may be particularly vulnerable to a variety of hack attacks;

15      •     Use a firewall to protect their computers from hacker attacks while it is connected
16 to a network, especially the internet;

17      •     Determine whether a border firewall should be installed where the business's
18 network connects to the internet. A border firewall separates the network from the internet and may
19 prevent an attacker from gaining access to a computer on the network where sensitive information is
20 stored. Set access controls—settings that determine which devices and traffic get through the firewall—
21 to allow only trusted devices with a legitimate business need to access the network. Since the protection
22 a firewall provides is only as effective as its access controls, they should be reviewed periodically;

23      •     Monitor incoming traffic for signs that someone is trying to hack in. Keep an eye
24 out for activity from new users, multiple log-in attempts from unknown users or computers, and higher-
25 than-average traffic at unusual times of the day; and

26      •     Monitor outgoing traffic for signs of a data breach. Watch for unexpectedly large
27 amounts of data being transmitted from their system to an unknown user. If large amounts of information

28

are being transmitted from a business' network, the transmission should be investigated to make sure it is authorized.

120.   SNSC engaged in unlawful and unfair acts and practices by failing to disclose the Data Breach to Class Members in a timely manner, contrary to the duties imposed by common law, Cal. Civ. Code § 1798.82, Ohio Rev. Code Ann. § 1349.19, and other state data breach notification statutes that are applicable. These unfair acts and practices were immoral, unethical, oppressive, unscrupulous, unconscionable, and/or substantially injurious to Plaintiff and Class members. The harm these practices caused to Plaintiff and Class members outweighed their utility, if any.

121.   SNSC engaged in unfair acts and practices by representing in its Privacy Policy that "to protect [Plaintiff's and Class members'] personal information from unauthorized access and use, [SNSC] uses security measures that comply with federal law" that "include computer safeguards, secured files and buildings", while knowingly failing to employ adequate safeguards to protect their data and failing to take proper action following the Data Breach to enact adequate privacy and security measures and protect Class members' personal and financial information from further unauthorized disclosure, release, data breaches, and theft. These unfair acts and practices were immoral, unethical, oppressive, unscrupulous, unconscionable, and/or substantially injurious to Plaintiff and Class members. The harm these practices caused to Plaintiff and Class members outweighed their utility.

122.   As a direct and proximate result of SNSC's acts of unfair and unlawful practices and acts, Plaintiff and Class members were injured and lost money or property, including the loss of their legally protected interest in the confidentiality and privacy of their personal and financial information, and additional losses described above.

123.   SNSC knew or should have known that its computer systems and data security practices were inadequate to safeguard Plaintiff's and Class members' personal and financial information and that the risk of a data breach or theft was highly likely. Defendant's actions in engaging in the above-named unfair practices and deceptive acts were negligent, knowing and willful, and/or wanton and reckless with respect to the rights of Plaintiff and members of the Class.

124.   Plaintiff and Class members seek relief under Cal. Bus. & Prof. Code § 17200, *et seq.*,

including, but not limited to, restitution to Plaintiff and Class members of money or property that Defendant wrongfully acquired from Plaintiff and Class members by means of Defendant's deceptive, unlawful, and unfair business practices, declaratory relief, attorney's fees and costs (pursuant to Cal. Code Civ. Pro. § 1021.5), and injunctive or other equitable relief.

WHEREFORE, Plaintiff and Class members pray for judgment as set forth below.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff DESIREE SCHMITT, individually, and on behalf of all others similarly situated, respectfully request that judgment be entered in their favor and against SNSC, as follows:

A.      Finding that this action satisfies the prerequisites for maintenance as a class action, and certifying the Class defined herein;

B.      Appointing Plaintiff as representative of the Class;

C.      Appointing Plaintiff's counsel as counsel for the Class;

D.      Entering judgment in favor of Plaintiff and the Class against Defendant;

E.      Awarding Plaintiff and Class members actual damages, and equitable relief, including injunctive relief, and all other forms of available relief, as applicable;

F.      Awarding Plaintiff and the Class attorney's fees and costs, including interest thereon as allowed or required by law; and

G.      Granting all such further and other relief as the Court deems just and appropriate.

## **DEMAND FOR JURY TRIAL**

Plaintiff Desiree Schmitt, individually, and on behalf of all others similarly situated, hereby demands a trial by jury on all claims so triable.

Dated: November 22, 2021                    Law Office of Mitchell Chyette


                                            By: /s/ Mitchell Chyette
                                            Mitchell Chyette
                                            Attorney for Desiree Schmitt

                                            125 12th Street, Suite 100-BALI
                                            Oakland, CA 94607-3699

36

(510) 388-3748
(510) 680-3760 facsimile
mitch@chyettelaw.com

Thomas A. Zimmerman, Jr. (pro hac vice)
tom@attorneyzim.com
Sharon Harris (pro hac vice)
sharon@attorneyzim.com
ZIMMERMAN LAW OFFICES, P.C.
77 W. Washington Street, Suite 1220
Chicago, Illinois 60602
(312) 440-0020 telephone
(312) 440-4180 facsimile
www.attorneyzim.com
firm@attorneyzim.com

Marc E. Dann (pro hac vice)
Brian D. Flick (pro hac vice)
DANNLAW
P.O. Box 6031040
Cleveland, Ohio 44103
(216) 373-0539 telephone
(216) 373-0536 facsimile
notices@dannlaw.com


Counsel for Plaintiff and the putative Class

Rev. 03.21

## FACTS

**WHAT DOES SN SERVICING CORPORATION (SNSC) DO WITH YOUR PERSONAL INFORMATION?**

| Why? | Financial companies choose how they share your personal information. Federal law gives consumers the right to limit some but not all sharing. Federal law also requires us to tell you how we collect, share, and protect your personal information. Please read this notice carefully to understand what we do. |
|---|---|

| What? | The types of personal information we collect and share depend on the product or service you have with us. This information can include: |
|---|---|

- Social Security number and account balances
- transaction history and credit history
- credit scores and mortgage rates and payments

When you are *no longer* our customer, we continue to share your information as described in this notice.

| How? | All financial companies need to share customers? personal information to run their everyday business. In the section below, we list the reasons financial companies can share their customers? personal information; the reasons SN Servicing Corporation chooses to share; and whether you can limit this sharing. |
|---|---|

| Reasons we can share your personal information | Does SN Servicing share? | Can you limit this sharing? |
|---|---|---|
| **For our everyday business purposes?** such as to process your transactions, maintain your account(s), respond to court orders and legal investigations, or report to credit bureaus | Yes | No |
| **For our marketing purposes?** to offer our products and services to you | Yes | No |
| **For joint marketing with other financial companies** | Yes | No |
| **For our affiliates? everyday business purposes** information about your transactions and experiences | Yes | No |
| **For our affiliates? everyday business purposes** information about your creditworthiness | Yes | Yes |
| **For our affiliates to market to you** | Yes | Yes |
| **For nonaffiliates to market to you** | Yes | Yes |

| To limit our sharing | Do any of the following: |
|---|---|

- Call toll free: **800-603-0836**
- Visit our Borrower Web Site: ?**https://borrower.snsc.com**
- Mail the **form** below

**Please note:**

If you are a *new* customer, we can begin sharing your information 30 days from the date we sent this notice. When you are *no longer* our customer, we continue to share your information as described in this notice.

However, you can contact us at any time to limit our sharing.

| Questions? | Call **800-603-0836** ?or ?go to SNSC?s borrower website at: **https://borrower.snsc.com** |
|---|---|

✂ ----------------------------------------------------------------------------------------------------------------------------------------------

## Mail-in Form

Mark any/all you want to limit:

- ❑ Do not share information about my creditworthiness with your affiliates for their everyday business purposes.
- ❑ Do not allow your affiliates to use my personal information to market to me.
- ❑ Do not share my personal information with nonaffiliates to market their products and services to me.

| Name | | Mail to: |
|---|---|---|
| Address | | SN Servicing Corporation |
| | | 323 5th Street |
| City, State,? Zip | | Eureka, CA 95501 |
| Account # | | |

**EXHIBIT A**

## What we do

| | |
|---|---|
| **How does SN Servicing Corporation protect my personal information?** | To protect your personal information from unauthorized access and use, we use security measures that comply with federal law. These measures include computer safeguards, secured files and buildings. |
| **How does SN Servicing Corporation collect my personal information?** | We collect your personal information, for example, when you<br><br>■ give us your income information or provide account information<br>■ give us your contact information or pay us by check<br>■ provide your mortgage information<br><br>We also collect your personal information from others, such as credit bureaus, affiliates, or other companies. |
| **Why can?t I limit all sharing?** | Federal law gives you the right to limit only<br><br>■ sharing for affiliates? everyday business purposes?information about your creditworthiness<br>■ affiliates from using your information to market to you<br>■ sharing for nonaffiliates to market to you<br><br>State laws and individual companies may give you additional rights to limit sharing. See below for more on your rights under state law. |
| **What happens when I limit sharing for an account I hold jointly with someone else?** | Your choices will apply to everyone on your account. |

## Definitions

| | |
|---|---|
| **Affiliates** | Companies related by common ownership or control. They can be financial and nonfinancial companies.<br><br>Our affiliates include companies with a ?Security National? or ?SN? common corporate identity and other financial companies including, but not limited to:<br><br>Alaska Eastern Partners, A Limited Partnership    SN Liquidating Trust 2011-A<br>Alaska Louisiana Partners, A Limited Partnership    SN Mortgage Loan Trust<br>Security National Funding Trust    Statewide Mortgage Loan Trust<br>Security National Mortgage Loan Trust    Sequoia Funding Trust |
| **Nonaffiliates** | Companies not related by common ownership or control. They can be financial and nonfinancial companies.<br><br>■ Nonaffiliates we can share with include other mortgage companies, insurance companies, credit bureaus, direct marketing companies, and rating agencies. |
| **Joint marketing** | A formal agreement between nonaffiliated financial companies that together market financial products or services to you.<br><br>■ Our joint marketing partners include banks, mortgage companies, and other lenders. |

## Other important information

**State Laws** - Our privacy and information sharing practices are in accordance with federal and state laws. California, Nevada and Vermont state laws limits the sharing personal information for their residents. We will not share personal information about California, Nevada or Vermont residents with non-affiliated third parties (Box 3) except as permitted by law. In the future if other states adopt privacy laws more restrictive than those under current federal or state law, SNSC will comply with those new laws.

**California**: If you have a California address, we will treat your account as if you opted out from sharing information with non-affiliated companies on the Privacy Form (Box 3). To further restrict the sharing of personal information with our affiliates, you can mark Box 1 and 2 on the Privacy Form, as well.

**Oregon**: Borrower: The Oregon Division of Financial Regulation (DFR) oversees residential mortgage loan servicers who are responsible for servicing residential mortgage loans in connection with real property located in Oregon and persons required to have a license to service residential mortgage loans in this state. If you have questions regarding your residential mortgage loan, contact your servicer at (servicer?s toll-free phone number and email, if applicable). To file a complaint about unlawful conduct by an Oregon licensee or a person required to have an Oregon license, call DFR at 888-877-4894 or visit dfr.oregon.gov.

**Nevada**: If you have a Nevada address, we do not share your information with non-affiliated third parties (Box 3). You may wish to further restrict the sharing of information by sending in the Privacy Form with Box 1 and 2 marked.

Please call the toll-free SNSC customer service number if you wish for SNSC to include you in our internal do not call registry. If you would like guidance about Nevada?s law regarding corporate do-not-call registries, please contact the *Bureau of Consumer Protection, Office of the Nevada Attorney General, 555 E. Washington Street, Suite 3900, Las Vegas, Nevada 89101*; Phone: (702) 486-3132, Email: BCPINFO@ag.state.nv.us.

**Texas:** COMPLAINTS REGARDING THE SERVICING OF YOUR MORTGAGE SHOULD BE SENT TO THE DEPARTMENT OF SAVINGS AND MORTGAGE LENDING, 2601 NORTH LAMAR, SUITE 201, AUSTIN, TX 78705. A TOLL-FREE CONSUMER HOTLINE IS AVAILABLE AT 877-276-5550.

**Vermont:** If you have a Vermont address, we will treat you as if you opted-out of sharing your information with affiliated or non-affiliated entities on the mail-in Privacy Form (Boxes 1, 2 and 3).



SERVICING CORPORATION
323 5TH STREET
EUREKA CA 95501

(800) 603-0836
Para Español, Ext. 2660 o 2643
8:00 a.m. – 5:00 p.m. Pacific Time
Main Office NMLS #5985
Branch Office NMLS #9785

2021-01-14

SCHMITT, DESIREE M

The following disclosures are provided for informational purposes and should not be considered as an attempt to collect a debt.  If you have received a discharge in bankruptcy and this debt was not reaffirmed, this correspondence is not an attempt to collect the debt as a personal liability.

SNS76306A1SA0AA.016305.01.03.000000

**EXHIBIT B**


## **NOTICE OF DATA BREACH**

Dear Borrower:

We are writing to inform you of a data security incident affecting SN Servicing Corporation ("SN") that has resulted in the exposure of some of your personal information. This letter contains information about the incident, steps we are taking to address the matter, and steps you can take to protect your personal information. Although we are not aware of the misuse of any of your information, we sincerely apologize for any inconvenience this incident may cause.

### **What Happened**

On or about October 15, 2020, SN experienced a cybersecurity attack known as "ransomware." During a ransomware attack, cyber attackers attempt to digitally lock a company's data and hold it for ransom. In response to the Incident, SN immediately locked down affected systems and engaged a third-party team of forensics experts to determine the potential impact to our borrowers. In addition, SN immediately notified the appropriate authorities of the Incident.

### **What Information Was Involved**

Based on the preliminary results of the investigation, we determined that some of your information has been acquired by the individual(s) responsible for the incident. At this time, it is believed that none of the information that was compromised included credit card information, or banking account information from checks or related materials.  The information compromised was largely limited to March 2018 Billing Statements and fee notices which may include, but is potentially not limited to: your name, address, loan numbers, balance information and billing information such as charges assessed, owed and/or paid.

We are still in the process of conducting a comprehensive investigation of this incident and you will be notified in the event we discover that any additional nonpublic personal information ("NPI") or personally identifiable information ("PII") pertaining to you was exposed. That being said, we felt it necessary to notify you of this event. As discussed above, we have no evidence at this time that any of your information has been misused.

### **What We Are Doing**

SN is bolstering its cybersecurity posture by:

- Replacing email filtering tools, malware software, and Internet monitoring tools with more robust solutions that utilize artificial intelligence (AI) to detect and block known and newly introduced malware.

- Blocking all inbound and outbound internet, email, and network traffic to foreign countries.

- Upgrading infrastructure to improve backup and recovery efforts if needed.

### **What You Can Do**

Out of an abundance of caution, we are encouraging you to remain vigilant over next twelve (12) to twenty-four (24) months, review your account statements and immediately report any suspicious activity.  We also recommend that you regularly obtain credit reports from each nationwide credit reporting agency and have information relating to fraudulent transactions, if any, deleted. If you believe you have been the victim of identity theft or need additional guidance with respect to identify theft, we encourage you contact the Federal Trade Commission ("FTC"). The FTC can be reached via telephone at 1-877-IDTHEFT (438-4338) or online at http://www.consumer.gov/idtheft. Further, we encourage you to review the enclosed list of recommended steps you can take to protect yourself.

### **For Additional Information**

Again, we sincerely apologize for any inconvenience caused by this Incident. We also want to assure you are committed to full transparency about the Incident. If you have any questions, please contact us at 1-800-603-

On or about October 15, 2020, SN experienced a cybersecurity attack known as "ransomware." During a ransomware attack, cyber attackers attempt to digitally lock a company's data and hold it for ransom. In response to the Incident, SN immediately locked down affected systems and engaged a third-party team of forensics experts to determine the potential impact to our borrowers. In addition, SN immediately notified the appropriate authorities of the Incident.

## What Information Was Involved

Based on the preliminary results of the investigation, we determined that some of your information has been acquired by the individual(s) responsible for the incident. At this time, it is believed that none of the information that was compromised included credit card information, or banking account information from checks or related materials. The information compromised was largely limited to March 2018 Billing Statements and fee notices which may include, but is potentially not limited to: your name, address, loan numbers, balance information and billing information such as charges assessed, owed and/or paid.

We are still in the process of conducting a comprehensive investigation of this incident and you will be notified in the event we discover that any additional nonpublic personal information ("NPI") or personally identifiable information ("PII") pertaining to you was exposed. That being said, we felt it necessary to notify you of this event. As discussed above, we have no evidence at this time that any of your information has been misused.

## What We Are Doing

SN is bolstering its cybersecurity posture by:

- Replacing email filtering tools, malware software, and Internet monitoring tools with more robust solutions that utilize artificial intelligence (AI) to detect and block known and newly introduced malware.

- Blocking all inbound and outbound internet, email, and network traffic to foreign countries.

- Upgrading infrastructure to improve backup and recovery efforts if needed.

## What You Can Do

Out of an abundance of caution, we are encouraging you to remain vigilant over next twelve (12) to twenty-four (24) months, review your account statements and immediately report any suspicious activity. We also recommend that you regularly obtain credit reports from each nationwide credit reporting agency and have information relating to fraudulent transactions, if any, deleted. If you believe you have been the victim of identity theft or need additional guidance with respect to identify theft, we encourage you contact the Federal Trade Commission ("FTC"). The FTC can be reached via telephone at 1-877-IDTHEFT (438-4338) or online at http://www.consumer.gov/idtheft. Further, we encourage you to review the enclosed list of recommended steps you can take to protect yourself.

## For Additional Information

Again, we sincerely apologize for any inconvenience caused by this Incident. We also want to assure you are committed to full transparency about the Incident. If you have any questions, please contact us at 1-800-603-0836 between the hours of 08:00pst and 18:00pst.

Sincerely,

SN Servicing Corporation



### *Additional Important Information*

**For residents of *Hawaii, Michigan, Missouri, Virginia, Vermont,* and *North Carolina:*** It is recommended by state law that you remain vigilant for incidents of fraud and identity theft by reviewing credit card account statements and monitoring your credit report for unauthorized activity.

**For residents of *Illinois, Iowa, Maryland, Missouri, North Carolina, Oregon,* and *West Virginia:***
It is required by state laws to inform you that you may obtain a copy of your credit report, free of charge, whether or not you suspect any unauthorized activity on your account. You may obtain a free copy of your credit report from each of the three nationwide credit reporting agencies. To order your free credit report, please visit www.annualcreditreport.com, or call toll-free at 1-877-322-8228. You can also order your annual free credit report by mailing a completed Annual Credit Report Request Form (available at https://www.consumer.ftc.gov/articles/0155-free-credit-reports) to: Annual Credit Report Request Service, P.O. Box 105281, Atlanta, GA, 30348-5281.

**For residents of *Iowa:*** State law advises you to report any suspected identity theft to law enforcement or to the Attorney General.

**For residents of *Oregon:*** State laws advise you to report any suspected identity theft to law enforcement, including the Attorney General, and the Federal Trade Commission.

**For residents of *Maryland, Rhode Island, Illinois, New York,* and *North Carolina:***
You can obtain information from the Maryland and North Carolina Offices of the Attorney General and the Federal Trade Commission about fraud alerts, security freezes, and steps you can take toward preventing identity theft.
**Maryland Office of the Attorney General** Consumer Protection Division, 200 St. Paul Place, Baltimore, MD 21202 1-888-743-0023 www.oag.state.md.us
**Rhode Island Office of the Attorney General** Consumer Protection, 150 South Main Street, Providence, RI 02903 1-401-274-4400 www.riag.ri.gov
**North Carolina Office of the Attorney General** Consumer Protection Division, 9001 Mail Service Center, Raleigh, NC 27699-9001 1-877-566-7226 www.ncdoj.com
**Federal Trade Commission** Consumer Response Center, 600 Pennsylvania Ave, NW Washington, DC 20580 1-877-IDTHEFT (438-4338) www.ftc.gov/idtheft
**New York Office of Attorney General** Consumer Frauds & Protection, The Capitol, Albany, NY 12224 1-800-771-7755 https://ag.ny.gov/consumer-frauds/identity-theft

**For residents of *Massachusetts:*** It is required by state law that you are informed of your right to obtain a police report if you are a victim of identity theft.

**For residents of all states:**

**Fraud Alerts:** You can place fraud alerts with the three credit bureaus by phone and online with Equifax (https://assets.equifax.com/assets/personal/Fraud_Alert_Request_Form.pdf); TransUnion (https://www.transunion.com/fraud-alerts); or Experian (https://www.experian.com/fraud/center.html). A fraud alert tells creditors to follow certain procedures, including contacting you, before they open any new accounts or change your existing accounts. For that reason, placing a fraud alert can protect you, but also may delay you when you seek to obtain credit. As of September 21, 2018, initial fraud alerts last for one year. Victims of identity theft can also get an extended fraud alert for seven years. The phone numbers for all three credit bureaus are at the bottom of this page.

**Monitoring:** You should always remain vigilant and monitor your accounts for suspicious or unusual activity.

**Security Freeze:** You also have the right to place a security freeze on your credit report. A security freeze is intended to prevent credit, loans, and services from being approved in your name without your consent. To place a security freeze on your credit report, you need to make a request to each consumer reporting agency. You may make that request by certified mail, overnight mail, regular stamped mail, or by following the instructions found at the websites listed below. The following information must be included when requesting a security freeze (note that if you are requesting a credit report for your spouse or a minor under the age of 16, this information must be provided for him/her as well): (1) full name, with middle initial and any suffixes; (2) Social Security number; (3) date of birth; (4) current address and any previous addresses for the past five years; and (5) any applicable incident report or complaint with a law enforcement agency or the Registry of Motor Vehicles. The request must also include a copy of a government-issued identification card and a copy of a recent utility bill or bank or insurance statement. It is essential that each copy be legible, display your name and current mailing address, and the date of issue. As of September 21, 2018, it is free to place, lift, or remove a security freeze. You may also place a security freeze for children under the age of 16. You may obtain a free security freeze by contacting any one or more of the following national consumer reporting agencies:

| **Equifax Security Freeze** | **Experian Security Freeze** | **TransUnion (FVAD)** |
| --- | --- | --- |
| P.O. Box 105788 | P.O. Box 9554 | P.O. Box 2000 |
| Atlanta, GA 30348 | Allen, TX 75013 | Chester, PA 19022 |
| https://www.equifax.com/personal/credit-report-services/credit-freeze/ | www.experian.com/freeze | freeze.transunion.com |
| 800-525-6285 | 888-397-3742 | 800-680-7289 |

More information can also be obtained by contacting the Federal Trade Commission listed above.



**Notice of Cybersecurity Incident**

**[Date]**, 2021

*Via Physical Mail*
<Individual>
<Address 1>
<Address 2>
<City><State><Zip>

Dear <Individual>,

Out of an abundance of caution, we are writing to inform you of a cybersecurity incident which affected the SN Servicing Corporation ("SN"). The cybersecurity incident may have resulted in the potential compromise of some of your data. This letter contains information about the incident and information about how to protect your personal information going forward. SN considers the protection of sensitive information a top priority, and sincerely apologizes for any inconvenience as a result of the incident.

**What Happened**
On or about October 15, 2020, SN discovered unauthorized access to its network. Upon discovery, SN immediately terminated the access and retained a specialized cybersecurity forensic team to conduct an investigation to determine the nature and scope of the Incident. The forensics team first identified the name and locations of files that were exfiltrated from the firewall records. This investigation concluded on or about November 24, 2020. Based on the results of the investigation, it was determined that an unauthorized party may have been able to access sensitive personal information for some of our borrowers.

SN was able to quickly identify a subset of documents which were believed to contain sensitive information for some borrowers. In the interest of notifying the borrowers as quickly as possible, a preliminary notice was provided for that collection of documents as quickly as possible. A data mining vendor was then hired to review the remaining documents to identify any additional individuals that may have been affected and what data may have been exposed. The data mining vendor provided its results on or about April 27, 2021.

SN engaged in a substantial data validation process to verify the accuracy of the data and reconcile to internal records. Immediately after concluding its validation procedures, SN procured credit monitoring for affected individuals and drafted notices to individuals, consumer credit reporting agencies, and state regulators as appropriate.

**What Information Was Involved**
While we have no reason to believe that your information has been misused as a result of this incident, we are notifying you out of an abundance of caution and for purposes of full transparency. Based on the investigation, the unauthorized party may have had access to one or more of the following data elements: name, contact information, date of birth, social security number, and loan/borrower information. Please note that not every data element was present for every individual. While we appreciate that the incident may be concerning, please note that SN is not aware of any instances of misuse of sensitive data.

**What We Are Doing**

Alabama • Albany • Atlanta • Austin • Baltimore • Beaumont • Boston • Chicago • Dallas • Denver • Edwardsville • Garden City • Hartford • Houston
Indiana • Kentucky • Las Vegas • London • Los Angeles • Miami • Michigan • Milwaukee • Mississippi • Missouri • Nashville • New Jersey • New Orleans
New York • Orlando • Philadelphia • Phoenix • San Diego • San Francisco • Sarasota • Stamford • Virginia • Washington, DC • Wellington • White Plains

**wilsonelser.com**

**EXHIBIT C**



SN engaged a specialized cybersecurity firm to conduct an investigation of the incident. Since the incident, SN has continued to strengthen its security posture. Additionally, we have also obtained complimentary credit monitoring for all affected individuals. We encourage you to take advantage of the complimentary credit monitoring services. We are making these services available to you at no cost; however, you will need to enroll yourself in these services.

<u>**What You Can Do**</u>

We recommend that you continue to remain vigilant in monitoring your personal information. The easiest way to do this is to take advantage of the complimentary credit monitoring and identity theft services we are offering to you. Details regarding these services are included in a separate attachment to this letter. To reiterate, we are making these services available to you at no cost; however, you will need to enroll yourself in these services.

There are additional steps you can take to protect yourself which are contained in the supplement to this letter titled "*Additional Important Information*."

The protection of your information is a top priority, and we sincerely regret any concern or inconvenience that this matter may cause. If you have any questions, please do not hesitate to call [PHONE NUMBER] Monday through Friday, between 8:00 AM and 5:00 PM Central time.

Sincerely,

**SN Servicing Corporation**

55 West Monroe Street, Suite 3800  •  Chicago, IL 60603  •  p 312.704.0550  •  f 312.704.1522

Alabama • Albany • Atlanta • Austin • Baltimore • Beaumont • Boston • Chicago • Dallas • Denver • Edwardsville • Garden City • Hartford • Houston
Indiana • Kentucky • Las Vegas • London • Los Angeles • Miami • Michigan • Milwaukee • Mississippi • Missouri • Nashville • New Jersey • New Orleans
New York • Orlando • Philadelphia • Phoenix • San Diego • San Francisco • Sarasota • Stamford • Virginia • Washington, DC • Wellington • White Plains
**wilsonelser.com**

256440278v.1

### *Additional Important Information*

**For residents of *Hawaii, Michigan, Missouri, Virginia, Vermont,* and *North Carolina*:** It is recommended by state law that you remain vigilant for incidents of fraud and identity theft by reviewing credit card account statements and monitoring your credit report for unauthorized activity.

**For residents of *Illinois, Iowa, Maryland, Missouri, North Carolina, Oregon*, and *West Virginia*:** It is required by state laws to inform you that you may obtain a copy of your credit report, free of charge, whether or not you suspect any unauthorized activity on your account. You may obtain a free copy of your credit report from each of the three nationwide credit reporting agencies. To order your free credit report, please visit www.annualcreditreport.com, or call toll-free at 1-877-322-8228. You can also order your annual free credit report by mailing a completed Annual Credit Report Request Form (available at https://www.consumer.ftc.gov/articles/0155-free-credit-reports) to: Annual Credit Report Request Service, P.O. Box 105281, Atlanta, GA, 30348-5281.

**For residents of *Iowa*:** State law advises you to report any suspected identity theft to law enforcement or to the Attorney General.

**For residents of *Oregon*:** State laws advise you to report any suspected identity theft to law enforcement, including the Attorney General, and the Federal Trade Commission.

**For residents of Maryland, Rhode Island, Illinois, New York, and North Carolina:** You can obtain information from the Maryland and North Carolina Offices of the Attorney General and the Federal Trade Commission about fraud alerts, security freezes, and steps you can take toward preventing identity theft.
**Maryland Office of the Attorney General** Consumer Protection Division 200, St. Paul Place Baltimore, MD 21202 1-888-743-0023 www.oag.state.md.us
**Rhode Island Office of the Attorney General** Consumer Protection 150 South Main Street, Providence RI 02903 1-401-274-4400 www.riag.ri.gov
**North Carolina Office of the Attorney General** Consumer Protection Division, 9001 Mail Service Center Raleigh, NC 27699-9001 1-877-566-7226 www.ncdoj.com
**Federal Trade Commission** Consumer Response Center, 600 Pennsylvania Ave, NW Washington, DC 20580 1-877-IDTHEFT (438-4338) www.ftc.gov/idtheft
**New York Office of Attorney General** Consumer Frauds & Protection, The Capitol Albany, NY 12224 1-800-771-7755 https://ag.ny.gov/consumer-frauds/identity-theft

**For residents of *Massachusetts*:** It is required by state law that you are informed of your right to obtain a police report if you are a victim of identity theft

**For residents of all states:**

**Fair Credit Reporting Act:** You are also advised that you may have additional rights under the federal Fair Credit Reporting Act.

**Fraud Alerts:** You can place fraud alerts with the three credit bureaus by phone and online with Equifax (https://assets.equifax.com/assets/personal/Fraud_Alert_Request_Form.pdf);                TransUnion



(https://www.transunion.com/fraud-alerts); or Experian (https://www.experian.com/fraud/center.html).  A fraud alert tells creditors to follow certain procedures, including contacting you, before they open any new accounts or change your existing accounts.  For that reason, placing a fraud alert can protect you, but also may delay you when you seek to obtain credit.  As of September 21, 2018, initial fraud alerts last for one year. Victims of identity theft can also get an extended fraud alert for seven years.  The phone numbers for all three credit bureaus are at the bottom of this page.

**Monitoring:** You should always remain vigilant and monitor your accounts for suspicious or unusual activity.

**Security Freeze:** You also have the right to place a security freeze on your credit report.  A security freeze is intended to prevent credit, loans, and services from being approved in your name without your consent.  To place a security freeze on your credit report, you need to make a request to each consumer reporting agency.  You may make that request by certified mail, overnight mail, regular stamped mail, or by following the instructions found at the websites listed below.  The following information must be included when requesting a security freeze (note that if you are requesting a credit report for your spouse or a minor under the age of 16, this information must be provided for him/her as well): (1) full name, with middle initial and any suffixes; (2) Social Security number; (3) date of birth; (4) current address and any previous addresses for the past five years; and (5) any applicable incident report or complaint with a law enforcement agency or the Registry of Motor Vehicles.  The request must also include a copy of a government-issued identification card and a copy of a recent utility bill or bank or insurance statement.  It is essential that each copy be legible, display your name and current mailing address, and the date of issue.  As of September 21, 2018, it is free to place, lift, or remove a security freeze.  You may also place a security freeze for children under the age of 16.  You may obtain a free security freeze by contacting any one or more of the following national consumer reporting agencies:

| **Equifax Security Freeze** | **Experian Security Freeze** | **TransUnion (FVAD)** |
|:---:|:---:|:---:|
| P.O. Box 105788 | P.O. Box  9554 | P.O. Box 2000 |
| Atlanta, GA 30348 | Allen, TX 75013 | Chester, PA 19022 |
| (800)-525-6285 | (888)-397-3742 | (800)-680-7289 |
| https://www.equifax.com/personal/ | www.experian.com/freeze | freeze.transunion.com |
| credit-report-services/credit-freeze/ | | |

More information can also be obtained by contacting the Federal Trade Commission listed above.

55 West Monroe Street, Suite 3800   •   Chicago, IL 60603   •   p 312.704.0550   •   f 312.704.1522

Alabama • Albany • Atlanta • Austin • Baltimore • Beaumont • Boston • Chicago • Dallas • Denver • Edwardsville • Garden City • Hartford • Houston
Indiana • Kentucky • Las Vegas • London • Los Angeles • Miami • Michigan • Milwaukee • Mississippi • Missouri • Nashville • New Jersey • New Orleans
New York • Orlando • Philadelphia • Phoenix • San Diego • San Francisco • Sarasota • Stamford • Virginia • Washington, DC • Wellington • White Plains

**wilsonelser.com**

256440278v.1